VAN SCHAICK v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. February 11, 1908.)

No. 61.

1. CRIMINAL LAW—WRIT OF ERROR—FINDINGS—REVIEW.

In a prosecution of the master of a vessel for criminal negligence and inattention to duty, it is not the duty of the Circuit Court of Appeals on a writ of error to examine and decide questions of fact on which the evidence is conflicting, but the verdict on such questions will be sustained if there is any substantial evidence in support thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, §§ 3074–3083.]

2. SHIPPING—CARRIAGE OF PASSENGERS—NEGLIGENCE OF MASTER—OFFENSES—STATUTES.

Rev. St. § 5344 (U. S. Comp. St. 1901, p. 3629), provides that every captain on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, etc., shall be guilty of manslaughter. *Held*, that intent or malice was not an element of such offense, and proof that accused was the captain of the vessel: that he was guilty of misconduct, negligence, or inattention to his duties thereon; and that by reason thereof human life was destroyed—was sufficient to sustain a conviction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 563.]

3. SAME—DEFENSES—INSPECTION.

In a prosecution of the captain of a vessel for manslaughter, due to his negligence, misconduct, and inattention to duty in the performance of certain duties imposed on him by law, it was no defense that the government inspectors had failed in their duty to properly inspect the vessel and its safety appliances, and had wrongfully issued a certificate of inspection.

4. SAME—DUTY OF MASTER.

Rev. St. § 4471 (U. S. Comp. St. 1901, p. 3049), provides for the maintenance of a steam fire pump and two hand pumps with pipes, one on each side of the vessel, to convey water to the upper decks to which suitable hose shall be attached and kept in good order at all times and ready for immediate use. United States Inspectors' rule 5, § 15, provides for a fire drill at least once a week, and section 4482 (U. S. Comp. St. 1901, p. 3054) requires good life-preservers in sufficient numbers, kept in accessible places for immediate use. *Held*, that it is the statutory duty of the captain to maintain an efficient fire drill, to see that the proper apparatus for extinguishing fire is provided and maintained in proper order, and to exercise ordinary care to see that the life-preservers are in fit condition for use.

5. SAME—BURNING OF VESSEL—INEVITABLE ACCIDENT—NEGLIGENCE.

Where an excursion steamboat was burned while plying quiet inland waters on a pleasant day with no vis major or unusual disturbance of the elements, and within half an hour after the fire broke out, 90 per cent. of the passengers had been drowned or burned to death, such catastrophe was not the result of inevitable accident, but was itself evidence of negligence and inattention to duty on the part of the master and crew.

6. SAME—STATION BILLS—NUMBERING CREW.

Where a station bill posted on a vessel assigning the crew to quarters in case of fire referred to the crew by number instead of names, but the members of the crew were not numbered, the posting of the bill did not constitute a compliance with the law requiring the posting of a station bill assigning the crew to quarters in case of fire.

7. SAME—FIRE DRILLS—FAILURE TO HOLD—EXCUSE.

Where an excursion steamer in New York Harbor had been inspected early in May, 1904, and was ready for navigation about May 15th, she

having been out but nine times prior to June 15th, when she was lost by fire, it was no excuse for the captain's failure to maintain fire drills as required by Inspectors' rule 5, § 15, that he had had no time or opportunity therefor, or that his crew was composed of raw material, and was constantly changing.

8. SAME—FIRE APPLIANCES—LIFE-PRESERVERS.

In a prosecution of the captain of a vessel for misconduct and inattention to duty, resulting in loss of life from a fire started in the forward hold of the vessel, evidence *held* to justify a finding that the captain was negligent in failing to provide, preserve, and inspect necessary fire appliances and life-preservers.

In Error to the Circuit Court of the United States for the Southern District of New York.

On writ of error to the Circuit Court for the Southern District of New York to review a judgment entered upon the verdict of a jury finding the defendant guilty under the third count of the indictment which charges him with misconduct, negligence and inattention to duty under section 5344 of the U. S. Revised Statutes (U. S. Comp. St. 1901, p. 3629), while acting as master of the steamer General Slocum. The opinion of the Circuit Court overruling demurrer to indictment is reported in 134 Fed. 592.

Dittenhoefer, Gerber & James (A. J. Dittenhoefer and Dudley F. Phelps, Jr., of counsel), for plaintiff in error.

Henry L. Stimson, U. S. Atty. (Henry L. Stimson, Goldthwaite H. Dorr, and Felix Frankfurter, of counsel), for the United States.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. The statute under which the indictment was drawn, in so far as it is necessary to consider it here, provides that every captain on any steamboat by whose misconduct, negligence or inattention to his duties on such vessel, the life of any person is destroyed, shall be deemed guilty of manslaughter. The defendant was convicted under the third count of the indictment which charges that from May 6, 1904, to and including June 15, 1904, he was master of steamboat General Slocum, a vessel authorized to navigate the bay and harbor of New York, rivers tributary thereto, Long Island Sound, etc. That as such master it was his duty to cause a station bill for his own and the engineers' department to be prepared, in which every person employed on said vessel should be assigned a post of duty in case of fire. That these station bills were required to be posted in the most conspicuous places on said vessel for the observation of the crew. That it was the duty of the defendant, at least once a week, to exercise the crew in the discipline and in unlashing and swinging out the lifeboats and in the use of the fire pumps and all other apparatus for the safety of life, in case of fire or other emergency and to see that all the equipments required by law were in complete working order and ready for immediate use. The third count further alleges that it was defendant's duty to see that the said vessel was provided with a double-acting steam pump or other equivalent apparatus for throwing water, equipped with at least two pipes, one on each side of said vessel for carrying water to the upper decks and that it should be kept in work-

ing order and ready for immediate use. That it was the defendant's duty to see that to these pipes, both between decks and on the upper deck, was attached by means of stopcocks or valves, good and suitable hose of sufficient strength to stand a pressure of not less than 100 pounds to the square inch, long enough to reach to all parts of the vessel and ready for immediate use. That it was also the duty of the defendant to see that two hand pumps, with suitable hose, ready for immediate use, were provided for the purpose of extinguishing fire on the said vessel. That it was also his duty to see that the life-preservers on the vessel were of the regulation buoyancy and equipment and were in good order and ready for immediate use. The indictment charges that the defendant wholly neglected to perform any of the duties or discharge any of the obligations required by law, as enumerated above. That he failed to prepare and post station bills, assign the crew to positions, or exercise them in their respective duties. That the hose provided for the pumps was weak, unfit, unserviceable and unable to withstand the strain required by law, no hose of any kind being provided for the hurricane and promenade decks or for use on the hand pumps. That the life-preservers were unsafe and unserviceable, being decayed, without the necessary buoyancy and fastening straps and useless for saving human life. The indictment further charges that on June 15, 1904, the General Slocum with not less than 1,200 passengers was navigating the East river when she was destroyed by fire and a large number of passengers, not less than 900, were drowned or burned to death. That by reason of the negligence and misconduct of the defendant there was an entire lack of discipline on said vessel after she caught fire, causing panic and confusion on board and, there being no adequate means for extinguishing the flames, no attempt to do so was made. That lifeboats were not launched or made ready for launching, that the life-preservers were useless and those who attempted to use them sank instantly and were drowned while others who remained on board sank into the flames and instantly died. In brief the indictment charges that the misconduct of the defendant, while master of the General Slocum, in failing to drill and discipline his crew and in failing to provide suitable life-preservers, hose and apparatus for fighting fire, caused the death of a large number of persons.

The General Slocum was built in 1891 and was a wooden, side-wheel, excursion steamboat, her length, over all, was about 250 feet, she had two stacks and three decks and was licensed to carry 2,500 passengers. The defendant had been her master since she was built. On the morning of June 15, 1904, between half-past 9 and a quarter of 10 the Slocum left her dock at the foot of Eighth street with a Sunday School excursion of between 1,000 and 1,100 persons, composed of men, women and a large number of children, the women predominating. She proceeded up the river by the North Channel. The point when the fire was first discovered is in dispute. This was a question of fact for the jury. It is argued here, as are many similar questions, as if it were the duty of this court to examine and decide it and base the final decision upon the conclusion reached. There is unquestionably a marked conflict in the testimony as to the point on the river where the fire was first discovered. The defendant contends that it was off the

spindle at the sunken meadows, the government that it was below the meadows and when the boat was opposite Ninetieth street in the vicinity of the Astoria Ferry. The jury may well have been convinced beyond a reasonable doubt that it occurred at the latter point. Certainly we cannot say that there was no evidence to support such a finding. Crumpton v. U. S., 138 U. S. 361, 11 Sup. Ct. 355, 34 L. Ed. 958.

As will be seen later, irrespective of the place where the fire was discovered, there was time to have extinguished or checked the flames had not every effort in that direction been frustrated by lack of discipline or failure of equipment. The fire originated in the forward hold which was directly aft of the quarters of the crew and forward of the hold containing the boilers. It was about under the center of the pilot house and was reached by a companion way on the starboard side of the vessel, the entrance being by a large door. The stairs ran athwart ships. This hold was used as a storeroom and for filling lamps, it contained oil barrels filled and partially filled, old rope, paint pots, straw, life-preservers and old junk generally. Upon discovering the fire the defendant ordered the boat full speed ahead, directing his course for the shelving beach at North Brother Island. Assuming that this order was given in the vicinity of Ninetieth street it would require from eight to twelve minutes to make the distance, about two miles, to North Brother Island where she was beached. The bow of the vessel after beaching was directly on shore so that one could jump from there onto dry land but from the paddle boxes aft there was a depth of water of from 10 to 15 feet. In order to avoid the flames the passengers were crowded together in the rear portion of the vessel. The flames spread with great rapidity soon after beaching, the decks fell in, many were drowned, some were burned, and in all over 1,000 persons lost their lives. The testimony indicates that the officers and crew were all saved and the truth of this statement was not challenged at the argument by the counsel for the defendant.

The offense of which the defendant has been convicted is statutory in character. Under the statute it was necessary for the United States to prove three propositions: First, that the defendant was captain of the Slocum. Second: that he was guilty of misconduct, negligence or inattention to his duties on the Slocum. Third: that by reason of such misconduct, negligence or inattention human life was destroyed. Intent is not an element of the offense, malice need not be proved and it is unnecessary to show that the acts or omissions which caused the loss of life were willful or intentional. U. S. v. Keller (C. C.) 19 Fed. 633; U. S. v. Holmes (C. C.) 104 Fed. 884.

The fact that a certificate signed by United States inspectors was filed certifying that the Slocum had been duly inspected and was permitted to navigate for one year from May 6, 1904, has little relevancy to the present issue. The law imposed certain duties upon the defendant, it also imposed duties upon the inspectors, but the fact that the inspectors failed in their duty is no reason why the defendant should be exculpated if he failed in his. The law placed upon him personally the obligation of seeing that this vessel had sufficient protection against fire, he could not delegate that duty, he had no right to rely solely upon

the statements of the inspectors, his duty was not discharged until he personally had seen to it that the required protection was furnished.

Section 4471 of the U. S. Revised Statutes (U. S. Comp. St. 1901, p. 3049) provides for a steam fire pump and two hand pumps with pipes, one on each side of the vessel, to convey water to the upper decks to which hose suitable in strength and length shall be attached, the hose and apparatus to be kept in good order at all times, and ready for immediate use.

Section 4405 of the U. S. Revised Statutes (U. S. Comp. St. 1901, p. 3017) provides that the Board of Inspectors shall establish necessary rules for carrying out the provisions of title 52 which shall have the force of law.

Rule 5, § 15, of these rules provides for a fire drill at least once a week, when the master shall "call all hands to quarters and exercise them in the discipline and in the unlashing and swinging out of the lifeboats, weather permitting, and in the use of the fire pumps and all other apparatus for the safety of life on board such vessel, and to see that all the equipments required by law are in complete working order, for immediate use."

Section 4482 of the U. S. Revised Statutes (U. S. Comp. St. 1901, p. 3054) provides for good life-preservers made of suitable material sufficient in number to accommodate all persons on the vessel, kept in accessible places and ready for immediate use.

Section 18 of Inspectors' rule 3 provides at length as to the character, construction and location of the life-preservers required to be carried by law. We have not quoted these provisions of law in extenso for the reason that the sections of the Revised Statutes and the inspectors' rules applicable to this controversy are quoted in full in the opinion of Judge Thomas overruling the demurrer. United States v. Van Schaick (C. C.) 134 Fed. 592.

Speaking generally, we think that the law required the defendant to maintain an efficient fire drill, to see that the proper apparatus for extinguishing fire was provided and maintained in efficient order and ready for immediate use and to exercise at least ordinary care in seeing that the life-preservers were in a fit condition for use. The jury found him guilty upon all three propositions and the question here is, was their verdict so plainly against the weight of evidence as to justify this court in setting it aside?

On a pleasant morning in June, on quiet inland waters with no vis major or unusual disturbance of the elements a fire breaks out upon an excursion steamboat and in half an hour afterwards 90 per cent. of the people on board have been drowned or burned to death. That such an appalling calamity could not have occurred without fault somewhere is manifest. Human skill and care could have prevented or mitigated the disaster. In other words it was not an inevitable accident. The defendant was in supreme command of the Slocum and was given almost unlimited authority from the owners to purchase the necessary equipment for safeguarding her against fire. Anything which he actually needed he received. In large matters he consulted with the so-called commodore of the line, but in ordinary matters, like the securing of additional life-preservers and hose, his requisition was honored by

the owners. He lived on the Slocum the year around and had been her master from the time she went into commission in July, 1891, a period of 13 years. During all that time he went over the vessel and knew her from stem to stern. He often visited the forward hold and was there quite frequently in May and June, preceding the fire. He knew, or should have known, of the oil, paint, junk, straw and other inflammable material there which might be ignited by the carelessness of passengers or crew or by a spark blown from a passing steamer through the open port holes. Counsel unites in describing the Slocum as "a tinder box." These facts are mentioned for the purpose of showing the high degree of care necessary to guard from danger the hundreds of helpless women and children who were constantly being carried by her. One who has charge of an ancient wooden building must be held to a higher degree of vigilance in guarding against fire than if the building were built of steel, concrete and stone. So the master of a wooden vessel filled with combustible materials and throused with hundreds of irresponsible human beings is required to exercise a greater degree of watchfulness than is the commander of a steel vessel carrying the ordinary load of comparatively experienced and intelligent passengers.

The action of the defendant in beaching the vessel at North Brother Island is not in question here, assuming this maneuver to have been wise and proper. We are unable with this exception to discover a single act of the master or crew which prevented the spread of the flames or mitigated materially the consequences of the conflagration. In these particulars the jury may well have been convinced that there was an entire lack of discipline on the part of the crew and an insufficiency and inadequacy of apparatus for fighting the fire. The station bills were posted, indeed they had been on the vessel since 1892, but did not give information by which all the members of the crew could learn the places assigned to them in case of disaster. They were assigned not by name but by number and, of course, the bill was meaningless unless the crew were numbered and knew what their numbers were, respectively. The station bill might, for instance, assign No. 5 to duty at the starboard standpipe on the promenade deck and No. 8 to the port standpipe, but if no one in the crew had been given these numbers it is manifest that these positions would remain unoccupied when the moment of danger arrived. It is not pretended that any member of the crew had been assigned a number for use in case of fire and, therefore, so far as being of assistance in emergency is concerned the station bill might as well have been a copy of the decalogue. In posting the station bills and omitting to assign numbers to the crew, the defendant utterly neglected the spirit of the law. The master at no time after May 6th called the crew to quarters and drilled them as to the duties of firemen, never exercised them in swinging out the lifeboats or in using the pumps and testing the hose, except that the deck hose was used at night for washing the decks. It is hardly pretended on the part of the defendant that any efficient drills took place in the season of 1904 but he seeks to avoid the consequences of his neglect by the contention that there was no time or opportunity therefor. He insists that even if the crew had been instructed as the law directs it

would have availed nothing in averting the disaster. The Slocum had been inspected early in May and was ready for navigation about the 15th day of May. She had been out but nine times with excursions and the remaining time before the busy season began was peculiarly adapted for drilling the crew and molding it into shape.

The proposition that defendant was not responsible for the conduct of his crew because it was composed of raw material and was constantly changing, cannot be maintained, to hold otherwise would be to sanction the proposition that the more ignorant the crew the less was the obligation to instruct them. The direct converse of the proposition is true, the greater their inexperience the stronger was the obligation of the defendant to instruct them; not only so, but he should not have attempted to navigate the Slocum at all unless she was in such a condition, both as to equipment and crew, that he could navigate her safely. In proportion as the crew became listless and inefficient, the watchfulness of the commander should have increased. If it be true, as the defendant testifies, that there were but seven effective men in the crew and that it requires six men to lower a lifeboat properly, it will be seen at a glance how utterly inadequate were the means provided for meeting the emergency in case of fire.

We cannot say that if the defendant had systematically instructed the crew in their duties, assigned each man to his post and required him to take it immediately on hearing the fire signal and had exercised them in stretching out the hose and getting a stream of water immediately on a given point, that it would not have arrested or stayed the progress of the flames. Such a drill, conducted once a week, might have resulted in producing order where confusion reigned supreme, and might have discovered the defective hose which proved useless at the vital moment. Assuredly we cannot say, upon testimony which indicates that there was no systematic effort to comply with the provision of the law as to drills, that the jury could not, properly, have found the defendant guilty in this regard.

Regarding the hose and pipes, there was evidence tending to show that the port standpipe had been used for filling the boilers, was connected with the Croton pipes and had not thereafter been connected with the fire pump. The chief engineer testified that it would have taken him over five minutes to divert the water pressure from the standpipe. He says:

"I didn't go to any valves connected with that pipe at the time of the fire and turn on any pressure. It never was used for that purpose and hadn't any connection with the actual pump. It had a connection down with the feed line, but went a roundabout way to do it. It went around, but we could have got water through it, if we had had plenty of time and no emergency."

This pipe, which might have aided in checking the fire, was, with the knowledge of the defendant, eliminated from the fire fighting equipment. Again, the jury would have been justified in finding that there was no fire hose attached to the standpipe on the promenade and hurricane decks connected up and ready for immediate use.

The second engineer says:

"During the season of 1904, I never saw any fire hose connected with the standpipe on the hurricane deck. No fire hose, or any other kind of hose, was attached to any valve on the promenade deck."

On the promenade deck there was hose coiled up but not connected with the standpipe. The jury might well have found that the hand pumps were useless for the reason that no hose was attached to them. As one of the witnesses testifies, "There was no hose on them; the pumps were ready for use." If these pumps had been fitted with the hose required by law and had been worked by men of intelligence and skill, who can say that it would have made no impression upon the fire?

The neglect which the jury may well have considered inexcusable has to do with the linen hose connected with the forward starboard standpipe on the main deck. If this had been available a stream could have been thrown immediately upon the fire. It is admitted on all sides, "that the fire did not burn through the main deck and that the marks of the fire in the hold after it was over were quite superficial, the main deck was hardly more than scorched." That a fire so ephemeral in character could have been smothered by a steady stream of water is not an unwarranted assumption. It was this hose, required by law to stand a pressure of 100 pounds to the square inch, which burst with a pressure of between 45 and 50 pounds. It is unnecessary to refer to all the testimony tending to show the defendant's negligence regarding this hose, a few references to the record will suffice. The defendant testified that it was on the Slocum continuously since 1891 and during the entire 13 years he never caused water to be put through it, or gave any instructions to test it, or saw water put through it. It was what is known as an "inside hose" intended to be hung in a dry place, but instead of this, while the boat was in commission it was hung where it was exposed to fog and dampness which causes such hose to weaken and deteriorate. We are unable to find even a plausible excuse for this palpable neglect of duty. The answer appears to be one of confession and avoidance, namely, the disaster would have occurred even if all the precautions required by law had been taken. It is said that the crew who were endeavoring to uncoil this hose were interfered with by excited passengers causing it to kink and burst. The answer is that there is nothing to show that the kinking produced the bursting, but even if it did, a well drilled crew, sufficient in number and intelligence, would have known enough to stretch 100 feet of hose without kinking or the interference of passengers. The unexcused negligence of the defendant in leaving this hose without use or testing for 13 years in connection with the fact that it burst the moment the water was turned on, is, in our judgment, alone sufficient to sustain the verdict of the jury.

On the subject of life-preservers the court charged the jury that they must assume that the life-preservers originally furnished were sufficient, that there was no pretense that the whole line had deteriorated to any appreciable extent between May 15th and June 15th, that it was for the jury to say whether they were out of condition and, if so, whether it was due to any fault of the defendant who was required to exercise only reasonable care regarding them. The court further charged the jury, that if through defendant's negligence any persons

wearing life-preservers were forced by the fire into the water where they were drowned, then the jury must find that the life-preservers were so insufficient, through defendant's neglect, that they contributed nothing to the efforts of such persons to keep their heads above the surface of the water. This was certainly as fair a statement of the question as the defendant could ask. The life-preservers had been on the Slocum from 9 to 13 years and only the most superficial tests had been made during this period. That many of them were useless on the day of the fire cannot be disputed successfully. Many could not be put on as they went to pieces as soon as taken from the racks and others which were adjusted proved inadequate, as persons wearing life-preservers were seen going down below the surface of the water and when brought up were found to be dead. The testimony is not so convincing as upon the other branches of the case, but was sufficient, we think, to warrant its submission to the jury.

To pass upon all the questions discussed would extend this opinion beyond all reasonable length. It is sufficient to say that we have examined all the exceptions argued and find no reversible error. The charge was clear and impartial and the verdict of the jury was fully justified by the proof. The excuses advanced on behalf of the defendant and so ably presented by his counsel, if sustained by this court, will place a premium upon misconduct, negligence, and neglect of duty. Owners and masters of vessels, who daily have the lives of thousands of helpless human beings in their keeping, should be held to the strictest accountability and required to exercise the highest degree of skill and care. In this way alone can human life be safeguarded and such appalling disasters, as that which befell the General Slocum, be effectually prevented.

The judgment is affirmed.