UNITED STATES of America, Appellee,

v.

Bartolo TRINIDAD DE LA ROSA, Defendant, Appellant.

No. 90–1765.

United States Court of Appeals, First Circuit.

Heard Sept. 14, 1990.

Decided Oct. 5, 1990.

Frederic Chardon Dubos, Carolina, P.R., for defendant, appellant.

Ernesto Hernandez–Milan, Asst. U.S. Atty., Hato Rey, P.R., with whom Daniel F. Lopez Romo, U.S. Atty., was on brief, for appellee.

Before TORRUELLA and CYR, Circuit Judges, and BOWNES, Senior Circuit Judge.

BOWNES, Senior Circuit Judge.

This sentencing appeal presents two issues: whether the district court erred in finding that defendant-appellant Bartolo Trinidad De La Rosa was not entitled to a three-level reduction for falling between a minimal and minor participant in the crime to which he pled guilty; and whether the district court erred in departing upward from the applicable guideline sentencing range. For the reasons that follow we find that the district court did not err in computing the offense level within the applicable guideline but did err in departing upward.

Defendant Trinidad pled guilty to one count of a five count indictment charging him with five violations of 8 U.S.C. § 1324(a)(1)(A)—bringing five illegal aliens

into the United States.[1] The aliens were part of a boatload of fifty such persons whom the defendant helped transport from the Dominican Republic to Puerto Rico. Two others were also charged in the indictment: Alejandro Diaz Bastardo and Marcial Hernandez Mejias.

## I. THE FACTS

As is usual with a plea of guilty, defendant entered into a written plea agreement with the government. In paragraph 5 of the agreement, defendant agreed "to cooperate voluntarily and fully with federal law enforcement authorities and the United States Attorney's Office." He also agreed that his cooperation would include telling the United States Attorney's office all he knew about the involvement of Diaz in bringing unlawful aliens into the United States "by means of a yawl." Defendant further agreed to testify at the trial against Diaz. Paragraph 9 of the plea agreement stated that the plea agreement "will stand" even if Diaz enters into a change of plea. Diaz did change his plea and was sentenced prior to the time defendant was sentenced.

The presentence report (PSR) is our only source for the facts of the crime and defendant's background. Defendant was 39 years old at the time of his arrest. He was a resident of the Dominican Republic. He had no record of prior criminal offenses. Defendant stated that he did not use either alcohol or drugs. He made a living doing odd jobs in the construction industry and working as a farmer. His education ended at the age of 7. He is unable to communicate in English and his use of Spanish is extremely limited.

The offense-conduct facts stated in the PSR are based on an investigation report of the United States Immigration and Naturalization Service and an interview with the prosecuting attorney. On April 5, 1990, the crew of a United States Customs Service plane spotted a yawl-type vessel close to the shore in the southern part of Rincon, Puerto Rico. The crew saw about 50 persons walking away from the vessel. They also noticed that the yawl was turning around and heading away from shore. A patrol boat was contacted. It intercepted the yawl about 1.5 miles offshore. Aboard the yawl were Diaz, Hernandez and defendant.

Hernandez and defendant told the authorities that Diaz was the owner of the vessel. It was Diaz who decided how many persons would make the trip to Puerto Rico. Hernandez and defendant originally intended to book passage as passengers on the yawl at the price of $5,000 for both of them. Diaz found out that they had some experience in operating a motor boat so he hired them to help him take the yawl to Puerto Rico. Each was to receive 10,000 Dominican pesos for helping to operate the vessel.

Although the PSR refers to Hernandez and defendant as "captains," it is clear that Diaz commanded the vessel. He navigated the vessel, except for one occasion when he got drunk. He then turned the navigation over to Hernandez but with specific instructions as to the compass bearings to follow. During the trip, Hernandez and defendant alternated in operating the boat, but defendant was under the supervision of Hernandez. There were 54 persons on the yawl.

After bringing the aliens to Puerto Rico, Hernandez and defendant agreed to return to the Dominican Republic with Diaz and bring another boatload of aliens to Puerto Rico. After the second trip, Hernandez and defendant intended to stay in Puerto Rico.

---

1. Section 1324(a)(1)(A) provides:
   (1) Any person who—
      (A) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien, ... shall be fined in accordance with Title 18, or imprisoned not more than five years, or both, for each alien....

The prosecution rated Diaz as the most culpable. He owned the vessel, arranged the trip and received between 1,500 and 2,500 Dominican pesos from each passenger. Hernandez was ranked second in culpability and defendant brought up the rear.

The guideline range of the sentence, as computed by the probation officer, was from no imprisonment to four months. This was based on the following computation. Section 2L1.1(a), which applies to the smuggling of an unlawful alien, has a base offense level of 9. The probation officer found that defendant's participation in the crime was more than minimal but less than minor and decreased the basic offense level by three levels pursuant to Section 3B1.2. There was neither a victim-related adjustment nor one for obstruction of justice. The offense level was reduced by two more levels for acceptance of responsibility. The total offense level was, therefore, four. Because defendant had no prior criminal history, no other adjustments were made. The imprisonment range was therefore zero to four months. The probation officer found no factors that would warrant a departure from the guidelines.

The sentencing judge did not follow the recommendation of the probation officer that there be a three-level decrease in the offense level. He, therefore, found the guideline imprisonment range to be between one and seven months. He then departed upward from the maximum guideline range and sentenced defendant to fifteen months imprisonment. This appeal followed.

## II. THE GUIDELINE COMPUTATION

■ There can be no doubt about the standard of review for a sentence computed within the applicable guideline:

A court of appeals "shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). In the present case, such "due deference" requires that we review the district court's fact-based application of the guidelines only for clear error. *See, e.g., United States v. Jimenez-Otero,* 898 F.2d 813, 815 (1st Cir.1990) (reviewing district court's application of guidelines to undisputed facts only for clear error). And where more than one reasonable inference may be drawn from undisputed facts, "the sentencing court's choice among supportable alternatives cannot be clearly erroneous." *United States v. Ruiz,* 905 F.2d 499, 508 (1st Cir.1990).

*United States v. Preakos,* 907 F.2d 7, 8 (1st Cir.1990). *See also United States v. Wright,* 873 F.2d 437, 443–44 (1st Cir.1989).

In light of the undisputed facts, it was not plain error for the district court to find that defendant was neither a minimal nor minor participant and did not fall between the two. Defendant took an active role in the smuggling trip. He took turns with Hernandez in operating the vessel and was paid for it. Although another judge might well have followed the recommendation of the probation officer, we cannot say that it was clearly erroneous not to do so.

## III. THE UPWARD DEPARTURE

■ Our standard of review of a departure from the guideline sentencing range is both plenary and clearly erroneous. In *United States v. Diaz-Villafane,* 874 F.2d 43 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989), the seminal case in this court on guideline departures, we set out a three-step review analysis:

First, we assay the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. That review is essentially plenary: whether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure is, we think, a question of law.

Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves factfinding and the trier's determinations may be set aside only for clear error. *See* 18 U.S.C. § 3742(d).

Third, once we have assured ourselves that the sentencing court considered cir-

cumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. 18 U.S.C. § 3742(e)(2)....

*Id.* at 49 (citations omitted).

█ We start our analysis by quoting the sentencing judge's reasons for the upward departure of eight months:

The defendant's cooperation with the government has been considered by the Court, and since I intend to depart, he should know that the departure is not going to be that high, because of my own standards and because of his cooperation. I have considered that cooperation he has given.

However, his participation in this offense placed the lives of 54 individuals in jeopardy. The circumstances of this have been expressed before on the record, when I sentence Mr. Diaz Bastardo and Mr. Hernandez.

Here, we should make a record of the fact that we intend to depart under Section 5K2.0, because the Guideline computation, as provided or suggested by the Guidelines Manual, does not adequately take into consideration the overall offense, behavior and circumstances of this case, where three persons, eventually, who were in charge of this boat, placed 54 human beings, in a wreckless [sic] manner, and endangered their life in an inhuman way, by transporting them from the Dominican Republic to Puerto Rico in a rudimentary otherwise unseaworthy for this kind of purpose boat, 34 foot yawl; packed them in like sardines and deposited them on the western beaches of the western coast of this Island, when we know that more than not these trips don't make it in full. Half of the people get drowned.

Therefore, a departure is going to be made in this case for this dangerous and inhuman behavior and treatment to others.

The judge then cited two cases as authority for his departure: *United States v. Gomez,* 901 F.2d 728 (9th Cir.1990); *United States v. Lira–Barraza,* 897 F.2d 981 (9th Cir. 1990), *reh'g granted,* 909 F.2d 1370.

Commentary 8 to § 2L1.1 states: "The commission has not considered offenses involving large numbers of aliens *and* dangerous *or* inhumane treatment. An upward departure should be considered in those circumstances." (Emphasis ours). This directive eliminates step one of the *Diaz–Villafane* analysis. We, therefore, proceed to step two—whether the circumstances referred to in the commentary actually exist in this case, i.e., were there large numbers of aliens and dangerous or inhumane treatment. We think that fifty persons meets the "large numbers" requirement. The only evidence on dangerousness is the number of people in the boat, but we can take judicial notice that fifty-four people crowded into a 34–foot yawl creates a dangerous condition. This was sufficient for following the commentary's directive that an upward departure be considered.

Because, however, the district court found both dangerous and inhumane treatment, we are constrained to address the finding that the aliens were inhumanely treated. We do not equate, as the sentencing judge apparently did, a dangerous voyage with inhumane treatment of the passengers. There is no evidence that they were deprived of food or water or suffered any particular hardship on the trip. There is no evidence as to how long the trip took.[2] There is no evidence that the boat was "otherwise unseaworthy," as the judge stated. Nor is there any factual basis in the record for the judge's assertion that "more than not these trips don't make it full. Half of the people get drowned."

The cases that the court cited are glaring examples of inhumane and ruthless conduct by those transporting aliens into the United States. In *United States v. Gomez,* 901 F.2d at 729, the defendant "placed seven adults and one six-year-old child in a

---

**2.** The distance from the Dominican Republic across the Mona Passage to the western coast of

Puerto Rico, where Rincon is located, is approximately fifty miles.

sealed compartment measuring six feet wide, six feet high, and two feet deep, located over the van's exhaust system." The court of appeals upheld the district court's finding that this evidenced a callous disregard for the safety of the aliens and was a valid reason for an upward departure. In *United States v. Lira–Barraza,* 897 F.2d at 987, the reason for the upward departure was that defendant participated in a high-speed automobile chase at speeds of over 90 miles an hour while transporting aliens, some of whom were confined in the trunk of the car. We do not consider either of these cases precedent for the finding of inhumane treatment in this case.

The commentary does not mandate an upward departure where there are a large number of aliens and dangerous treatment, only that it "should be considered." We think, therefore, that *Diaz–Villafane* requires us to determine whether the upward departure was reasonable. We agree with the district court that the overcrowding of the boat created a dangerous condition, but defendant was not responsible for the danger, nor did he contribute to it. Diaz owned the boat and determined the number of passengers. Defendant started out as a passenger. He became a member of the crew after Diaz learned that he and Hernandez had some experience operating motorboats. Defendant would have been on the boat only as a passenger if Diaz had not hired him to help operate it. This was not a joint venture involving Diaz, defendant and Hernandez.

We recognize that reasonableness is essentially a judgment call and that appellate review must give deference to the sentencing judge's "feel for the case." *Diaz–Villafane,* 874 F.2d at 49–50. The sentencing judge's "feel" for the case, however, is not an unshakeable grip over it. As we said in *United States v. Ocasio,* 914 F.2d 330 at 337 (1st Cir.1990): "Although the guidelines 'envision[ ] considerable discretion in departure decisions,' *Diaz–Villafane,* 874 F.2d at 52, that discretion is not unbridled. Departures perforce remain 'the exception, not the rule.' [*U.S. v.* ] *Aguilar–Pena,* 887 F.2d [347] at [347] 350 [ (1st Cir.1989) ]." We do not think it was reasonable to punish defendant for a condition over which he had no control and to which he did not contribute.

## CONCLUSION

Because we have upheld the district court's within-guideline computation, there is no reason to have a new sentencing hearing.

It is ordered that the upward departure sentence be eliminated and that defendant be imprisoned for a period of seven months which is the maximum term of imprisonment under the guideline sentence as determined by the district court.

Affirmed in part, reversed in part, remanded for correction of sentence.