UNITED STATES of America, Appellee,

v.

Zaw MOE, Defendant,

Amir Humuntal Lubman Tobing, San Lwin, Defendants–Appellants.

Nos. 1123, 1124, Dockets 95–1419 to 1422.

United States Court of Appeals, Second Circuit.

Argued March 21, 1995.

Decided Sept. 5, 1995.

---

Alan Drezin, Brooklyn, NY (Office of Alan Drezin, of counsel), for defendant-appellant Tobing.

Joel R. Weiss, Manhasset, NY (Law Office of Joel R. Weiss, of counsel), for defendant-appellant Lwin.

Judith Lieb, Assistant U.S. Attorney, Brooklyn, NY (Zachary W. Carter, U.S. Attorney, Julie Katzman, Assistant U.S. Attorney, of counsel), for appellee.

Before: OAKES, KEARSE and LEVAL, Circuit Judges.

OAKES, Senior Circuit Judge:

Amir Tobing and San Lwin appeal from judgments of conviction entered on July 20, 1994, and July 28, 1994, by the United States District Court for the Eastern District of New York, Reena Raggi, *Judge*, after their guilty pleas to one count of conspiring to smuggle aliens into the United States in violation of 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 & 1325. Tobing was sentenced to 48 months' imprisonment, and Lwin to 54 months.

In imposing both sentences, the district court upwardly departed pursuant to Application Note 5 of the alien smuggling guideline, U.S.S.G. § 2L1.1, which provides that an upward departure may be warranted "[i]f the offense involved dangerous or inhumane treatment, death or bodily injury, possession of a dangerous weapon, or substantially more than 100 aliens." Tobing and Lwin appeal, challenging both the factual underpinnings of the departures and the magnitude of the upward adjustments. We affirm both sentences.

### Background

Amir Tobing and San Lwin were each, at different times, captain of a cargo ship called the Golden Venture, which traveled from Singapore, Thailand and Kenya to the shores

of New York smuggling over 290 Chinese nationals in its hold. The boat was intentionally grounded off the Gateway National Recreation Area in Queens in turbulent waters, and ten of the passengers died trying to swim ashore.

## I. *The Voyage*

The smuggling scheme began in January 1993, when a smuggler known as "Charlie" arranged for the purchase of the Golden Venture to be used for transporting Chinese nationals to the United States. Charlie leased space on the boat to other smugglers known as "snakeheads." The snakeheads, in turn, recruited passengers for the voyage. The average smuggling fee per passenger was approximately $30,000. Charlie planned that the Golden Venture would set sail from Bangkok, Thailand, pick up approximately 150 Chinese nationals off the coast of Thailand, and then travel to Mombasa, Kenya, where it would pick up 200 additional Chinese nationals.

A man named Kin Sin Lee who worked for Charlie was placed in charge of the Golden Venture. In January 1993, Kin Sin Lee went to Singapore to finalize the purchase of the boat. Through a shipping agent in Singapore, Charlie hired a full crew of twelve Indonesian seamen, headed by defendant Tobing, who was named captain. Kin Sin Lee and the crew sailed the Golden Venture from Singapore to Bangkok.

When the ship arrived in Bangkok, six of the crew members resigned and were replaced with seven Burmese seamen, including the defendant San Lwin, who was made first officer. According to Kin Sin Lee, Lwin represented the Burmese crew members in discussions concerning their employment. This was corroborated by Zaw Moe, one of the Burmese crew members, and by Lwin himself, in an unmailed letter he wrote to his wife during the voyage.

Kin Sin Lee testified that before the boat left Bangkok, he informed the crew that the purpose of the voyage was to transport Chinese nationals to the United States. He specifically told them that the vessel was to pick up one set of Chinese nationals off the coast of Thailand and another set which had

been stranded in Africa. Crew members were offered substantial bonuses for their participation in the illegal activity. Tobing was to receive a salary of $2,000 per month plus a $40,000 bonus if the enterprise succeeded. Lwin was to receive $1,600 per month—double his usual monthly salary—plus an $8,000 bonus for successful completion of the voyage.

The Golden Venture sailed from Bangkok in February 1993, carrying Kin Sin Lee, Captain Tobing, First Officer Lwin and the eleven other crew members. A few days later, approximately ninety Chinese passengers—about sixty less than anticipated—boarded the boat offshore near Pattaya, Thailand. The boat then traveled to Mombasa, Kenya, where approximately 200 more Chinese nationals boarded the boat as scheduled. At this point in the voyage, Kin Sin Lee recruited twelve of the passengers to act as managers to help him maintain order.

Conditions on the Golden Venture, which was designed to carry cargo, were wretched. While the crew members, including Tobing and Lwin, enjoyed their own cabins and use of a private kitchen, the nearly 300 passengers were crammed into the forty-foot-by-twenty-foot hold of the vessel. A single stationary ladder provided access to the deck. No life boats or life preservers were available. Water and food were severely rationed. The single toilet on board was reserved for Kin Sin Lee, Tobing, Lwin, and the eleven other crew members, and the twelve Chinese managers, as well as the few female passengers, while the male passengers were required to use the deck of the boat as a latrine.

During the initial phase of the voyage, Captain Tobing, under the direction of Kin Sin Lee, was in charge of the crew. Zaw Moe testified, however, that the Burmese crew members received most of the captain's orders through San Lwin. Additionally, Kin Sin Lee testified that he generally spoke to Lwin directly in matters relating to the Burmese crew members.

Several weeks after the Golden Venture left Mombasa, a series of events transpired which culminated in the violent removal of

Captain Tobing from his command. The boat sailed from Mombasa to a designated point in the Atlantic Ocean where it was scheduled to rendezvous with smaller boats which would ferry the passengers to the United States. When no boats arrived, Kin Sin Lee tried to pressure the shore-based snakeheads into sending boats by falsely informing them that food and fuel supplies were low. Instead of sending out boats, however, the snakeheads arranged for the Golden Venture to obtain additional supplies on the island of Madeira before attempting another mid-Atlantic rendezvous.

Kin Sin Lee testified that Captain Tobing favored the trip to Madeira because he believed that, once in Madeira, they could lure one of Charlie's employees aboard and hold him hostage until the smaller boats were dispatched. Kin Sin Lee further testified, however, that he (Lee) believed that if the boat turned back east toward Madeira the passengers would revolt. Thus, Kin Sin Lee testified, he consulted with the twelve Chinese managers and together they plotted to take over the boat from Captain Tobing.

The "mutiny" took place on May 17, 1993. Kin Sin Lee provided the managers with a gun, six knives and three sticks to use in the mutiny. He told the managers to guard the captain with a gun and to kill him if necessary. During the mutiny, the crew was handcuffed by the managers and guarded by men wielding knives and sticks. Captain Tobing and the chief engineer were relieved of their duties for the duration of the voyage.

After the mutiny, Kin Sin Lee presented First Officer Lwin with two options: Lwin could continue on the voyage, essentially as a passenger, and remain unharmed, or he could take on the position of captain and be guaranteed his salary and bonus. According to Kin Sin Lee's testimony, San Lwin accepted Lee's offer and was named captain.

Lwin sailed the Golden Venture west toward New York harbor. As they sailed, Kin Sin Lee contacted Charlie and was informed that the small boats would not be meeting them. He was instructed to sail to New York harbor and moor in the East River. Lwin objected to this plan, and some snakeheads instructed Lee to sail instead to Rock-away Point and run the ship aground. Lwin's only question at this stage was whether Rockaway Point had a sandy bottom, and Charlie confirmed that it did.

The passengers were given special instructions in preparation for the grounding. They were told to crouch down on the floor of the hold at the moment of impact. They were also told that, after the grounding, every passenger who knew how to swim should swim to shore. The others were told to stay on board and someone on shore would arrange to have them picked up.

Late in the evening of June 5, 1993, Kin Sin Lee ordered Lwin to run the boat aground. Kin Sin Lee and Lwin instructed the crew to sail full speed to shore, but, at the last minute, Lwin grabbed the helm and turned the ship back, apparently because he had seen a breakwater ahead, making it too dangerous to proceed. From the sea charts, Lwin selected an alternate location that appeared to have a sandy bottom. Lwin sailed the boat to that location, and, under the orders of Kin Sin Lee, ran the boat aground. As soon as the boat hit a sandbar, most of the passengers, as instructed, jumped into the water, and Lwin also jumped overboard and began swimming to shore. The sea was extremely rough, and ten of the people who jumped off the boat eventually drowned or died from hypothermia.

## II. The Prosecution

In the months following the grounding, Tobing, Lwin, and ten lower-ranking crew members were indicted for their participation in the smuggling operation. Kin Sin Lee and seven of the Chinese managers were also indicted. On January 5, 1994, Tobing pled guilty to one count of conspiracy to smuggle aliens into the United States in violation of 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1325, pursuant to a cooperation agreement with the government. On January 13, 1994, Lwin pled guilty to the same count, pursuant to a plea agreement made under Fed. R.Crim.P. 11(e)(1)(C), in which the parties stipulated to a specific sentence of one year and one day. Seven codefendants also pled guilty to the same count pursuant to agree-

ments made under Rule 11(e)(1)(C), and likewise stipulated to specific sentences.

On April 8, 1994, the district court, after reviewing the presentence reports, refused to accept the pleas made pursuant to Rule 11(e)(1)(C). The court noted that by accepting the pleas it would be bound to impose the sentences agreed upon by the parties. The court stated that, in its view, the agreed-upon sentences did not reflect the severity of the defendants' offenses and, if imposed, risked trivializing the crimes that were committed. Ultimately, Lwin and the codefendants reentered their guilty pleas to the conspiracy count, but without any Rule 11(e)(1)(C) restrictions on the court's sentencing powers. In late June 1994, the court held extensive sentencing hearings at which Kin Sin Lee, Zaw Moe and San Lwin testified.

Tobing and Lwin were sentenced on July 13, 1994. For both defendants, the court began with a base offense level of 9 (U.S.S.G. § 2L1.1), added six levels because the offense involved transportation of more than 100 aliens (U.S.S.G. § 2L1.1(b)(2)(C)), and added three additional levels because the defendants had played a managerial role in the operation (U.S.S.G. § 3B1.1(b)). The court then reduced Tobing's offense level by 3 and Lwin's by 2 for acceptance of responsibility (U.S.S.G. § E1.1), resulting in total offense levels of 15 and 16, respectively. As both defendants fell in criminal history category I, the applicable guideline ranges were 18 to 24 months for Tobing and 21 to 27 months for Lwin. The district court, however, upwardly departed for both defendants pursuant to Application Note 5 of U.S.S.G. § 2L1.1, which provides that "[i]f the offense involved dangerous or inhumane treatment, death or bodily injury, possession of a dangerous weapon, or substantially more than 100 aliens, an upward departure may be warranted." U.S.S.G. § 2L1.1, comment. n. 5 (1994). The court sentenced Lwin to 54 months of incarceration. As to Tobing, the court found that a five-year sentence was appropriate, but the court downwardly departed one year because of the substantial assistance Tobing provided to the government, as documented in a letter provided by the government to the court pursuant to U.S.S.G. § 5K1.1. The

court thus sentenced Tobing to 48 months of imprisonment.

This appeal ensued.

**Discussion**

On appeal, Tobing and Lwin each argue that the testimony elicited at their sentencing hearing does not support upward departures in their cases, and, in the alternative, that the magnitude of the departures was unreasonable.

■ A court may depart from the Sentencing Guidelines if it determines "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). *See also United States v. Fan*, 36 F.3d 240, 245 (2d Cir.1994); *United States v. Merritt*, 988 F.2d 1298, 1311–12 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993). In this case, the district court departed upwardly pursuant to Application Note 5 of U.S.S.G. § 2L1.1, in which the Sentencing Commission explicitly lists aggravating circumstances not taken into consideration in crafting the guidelines for alien smuggling. Thus, any one of those factors, if present in a case, may justify an upward departure.

*A. Amir Tobing*

In deciding whether to depart upwardly in imposing Tobing's sentence, the court noted that "[w]hat is striking about this case is that all of [the upward departure factors listed in Application Note 5] are present as to one defendant or another." Tr. of Afternoon Sentencing, July 13, 1994, at 9. The court then considered to what extent any of these factors were properly attributable to Tobing.

The court found, first, that "it appears undisputed that after May 17th, [Tobing] did not have any further responsibilities on board the Golden Venture." *Id.* at 11. As such, the court held that it "would not hold him responsible for such reckless conduct as grounding the ship." *Id.* But, the court found, "from the start ... [Tobing] understood that the Golden Venture was a cargo ship, not equipped to hold human passengers.

Nevertheless, he agreed to play [a part in the scheme] for a substantial fee." *Id.* at 12. Thus, the court held that "the fact that there were more than 100 people whom he was involved in smuggling, the fact that the[y] were subject to dangerous and inhumane conditions, all seems attributable to him." *Id.* The court further observed that "it's difficult indeed to think of anyone more significant to a smuggling scheme involving a boat than a captain of the boat, particularly when we're talking not about one of these one day smuggling trips . . . ." *Id.* at 17.

■ Tobing argues that the district court's finding that the conditions on the boat were "inhumane" within the meaning of Note 5 was clearly erroneous. Tobing admits that the conditions were "squalid," but argues that the district court's finding was a subjective one based on Judge Raggi's life experiences, and that "[t]o the people who were fleeing their oppressive existences in the People's Republic of China, the conditions on the boat were not inhumane." Brief for Defendant–Appellant Tobing, at 19. Tobing relies, in part, on *United States v. Trinidad De La Rosa,* 916 F.2d 27, 30 (1st Cir.1990), in which the First Circuit found that inhumane conditions could not necessarily be implied from the fact that the voyage was dangerous.

We cannot agree with Tobing's contention. We find that the district court's determination that the conditions on the Golden Venture were inhumane is fully supported by the testimony elicited at the sentencing hearing, and is in no way erroneous. This case is in no way comparable to *Trinidad De La Rosa,* which concerned only a fifty-mile voyage from the Dominican Republic to Puerto Rico, and in which the court found "no evidence that [the passengers] were deprived of food or water or suffered any particular hardship on the trip." 916 F.2d at 30 & n. 2. In contrast, the record in this case reveals conditions which stagger the mind—nearly 300 passengers packed somehow into 800 square feet of cargo space for a voyage halfway around the world, lasting more than three months, with inadequate water and food, no toilet facilities, no life preservers or life boats, and only a single ladder providing a means of escape from the hold. *Cf. United States v. Trinidad–Lopez,* 979 F.2d 249, 253 (1st Cir.1992) (transportation of 104 aliens without food, life jackets or navigation equipment in a boat designed for 15 passengers is both dangerous and inhumane). We believe it is an understatement to call these conditions inhumane, and we cannot imagine that the passengers escaping China thought otherwise.

■ Tobing argues, secondly, that it was unreasonable for the district court to hold him responsible for the dangerous conditions on the boat, when testimony at the sentencing hearing showed that the land-based snakeheads were responsible for the number of passengers and the conditions on board the boat. Again, we cannot agree. As captain of the boat, Tobing cannot escape responsibility for conditions on board. The testimony shows that Tobing was fully familiar with the smuggling operation and the conditions on board the boat from the outset of the voyage, and, yet, he voluntarily chose to participate as captain of the boat—a role crucial to the success of the operation. It thus was not erroneous for the court to conclude that he was, along with others, responsible for the large number of passengers and the conditions on the boat.

■ Tobing argues, thirdly, that the magnitude of the 36–month upward departure was unreasonable. In reviewing the magnitude of an upward departure, we evaluate "whether the departure is reasonable in light of the justification given." *United States v. Campbell,* 967 F.2d 20, 27 (2d Cir. 1992). We consider only the court's stated reasons for departure, rather than any additional rationales supplied by the government. *United States v. Barone,* 913 F.2d 46, 50 (2d Cir.1990).

In determining the magnitude of the departure in Tobing's sentence, Judge Raggi found that "there are grounds present for both upward and downward departure. And I'm going to have to balance the totality of these facts." Tr. of Afternoon Sentencing, July 13, 1994 at 17. The judge first considered the defendant's responsibility for the dangerous and inhumane conditions on the boat, stating that she wanted "to emphasize

how culpable I think Mr. Tobing is for the tragedy that is the Golden Venture." *Id.* The judge then considered the need for general deterrence where, as here, the "ringleaders are motivated by nothing other than greed and personal gain." *Id.* at 19. She found that "[i]t is important that such people, such ringleaders, not be able to find experienced seam[e]n to carry out their plans." *Id.* at 19. Finally, Judge Raggi "[c]redit[ed] [Tobing's] cooperation as proffered by the government." *Id.* at 20. Upon full consideration of these factors the judge found that, absent Tobing's cooperation with the government, a five-year sentence would be justified, but, in light of the government's 5K1.1 letter, a sentence of 48 months of incarceration was reasonable.

The judge's departure in this case was substantial, but we think it was entirely merited. In light of the appallingly dangerous and inhumane conditions and the large numbers of aliens on board the boat (certainly "substantially more than 100," *see* U.S.S.G. § 2L1.1, applic. note 5), and, as the district court noted, because of the particular need for deterrence, the court's upward departure from an 18-to-24 month range to 60 months was reasonable and fully supported by the circumstances of the case.[1]

 Finally, Tobing argues that the court abused its discretion by downwardly departing only one year for the "substantial assistance" he provided the government. As we have held in the past, "[i]t is beyond question that we may not review a district court's determination not to grant a downward departure. It follows logically, then, that neither may we review, at defendant's request, the *extent* of any departure the court may grant." *United States v. Lawal,* 17 F.3d 560, 562 (2d Cir.1994) (quoting *United States v. Doe,* 996 F.2d 606, 607 (2d Cir. 1993) (emphasis in original)). The only exceptions to this rule are that a defendant may appeal the extent of a downward departure if the departure was made in violation of

the law or as a result of a misapplication of the Guidelines. *Id.* at 562–63. As neither of these circumstances is present in this case, we may not review the extent of the court's downward departure.

### B. San Lwin

As to San Lwin, the district court found that several factors set out in Application Note 5 justified an upward departure. The court found that "[w]hen [Lwin] signed on board . . . he knew he was on board a smuggling boat." Tr. of Morning Sentencing, July 13, 1994 at 148. The court found further that "he knew that more than 100 people were going to be involved in this. He knew the conditions were dangerous and inhuman [sic], and he knew there was the potential for the loss of life." *Id.* at 148–49. The court also found that "he played a direct part in the action that ultimately led to the death and injuries of so many people." *Id.* at 151. After hearing Lwin's testimony, Judge Raggi rejected Lwin's argument that he was coerced. The judge "found him incredible in almost every aspect of his testimony," and was "not persuaded that his actions were motivated by fear." *Id.* at 150. Thus, the court determined that a "severe upward departure" was warranted. *Id.* at 151.

 Lwin argues that no evidence presented at the sentencing demonstrated that he had any role in creating the dangerous and inhumane conditions on the boat, that he in any manner contributed to them, or that he was responsible for them. We find, to the contrary, that the record of the sentencing hearing provides ample support for the district court's findings that Lwin knew of the smuggling scheme before he agreed to participate, that he knew of the plans for taking on far more than 100 aliens, and that he was aware of the dangerous and inhumane conditions on board the boat. He nonetheless agreed to participate in the scheme, he furthered the plan by acting in a supervisory

---

1. We also find no merit in Tobing's contention that the magnitude of upward departure was unreasonable because alien smugglers in unrelated cases in other circuits have received lower sentences. It goes without saying that this argument must fail, because every defendant and every case must be evaluated individually by a sentencing judge and by a reviewing court of appeals. What is a reasonable sentence for one defendant may, of course, be unreasonable for another, even with the Sentencing Guidelines as the guide.

position, and he participated in an action—the grounding of the boat—that led to the deaths of ten people. The record shows that even before he was made captain of the boat, as first officer he held a position of some responsibility. After he became captain, the record shows that he participated in the decisions that led to the grounding of the boat. Thus, the district court was justified in finding Lwin responsible for the number of passengers on board, the conditions on the boat and for the events that led to the deaths of the passengers.

Lwin also argues that the magnitude of the upward departure was an abuse of the district court's discretion. Lwin argues that the court improperly based its departure on "Lwin's failure to act heroically after the grounding of the ship." Brief for Defendant–Appellant Lwin, at 28. The court, in imposing sentence, did note that it "was struck throughout [Lwin's] testimony, by his total lack of concern for the passengers on board this boat.... After the grounding, his singular thought was for himself.... He was one of the first people to jump off this boat." Tr. of Morning Sentencing, July 13, 1994, at 150–51. The court also made clear, however, that its departure was based on the number of aliens involved, the conditions on the boat, and the deaths of ten passengers for which Lwin was in part responsible—factors, as set out in Note 5, which were not taken into account by the sentencing guidelines. *Id.* at 151. For all the reasons stated by Judge Raggi, we find that the upward departure from a 21–to–27 month range to 54 months was reasonable and fully justified by the circumstances of this case.

### Conclusion

We have fully considered the other arguments raised by the defendants on appeal, and find them without merit. Both sentences are affirmed.