**UNITED STATES of America, Appellee,**

v.

**Lee Peng FEI, aka Ma Lee, aka Char Lee, Defendant–Appellant.**

Nos. 98–1713, 98–1714.

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 2000

Decided: Sept. 13, 2000

James T. Moriarty, New York City, for Defendant–Appellant.

Jodi L. Avergun, Assistant United States Attorney, Brooklyn, NY (Loretta E. Lynch, United States Attorney, David C. James, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY, of counsel), for Appellee.

Before: CARDAMONE, LEVAL, and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge:

On this appeal, defendant Lee Peng Fei (Lee) challenges his conviction for seaman's manslaughter and his sentence for misconduct causing the deaths of six aliens attempting to enter the United States illegally. Lee orchestrated and financed the transportation of 300 undocumented Chi-

nese nationals to this country in a cargo ship called the *Golden Venture* that carried them from Mombasa, Kenya to the United States under extraordinarily inhumane conditions. The *Golden Venture* was deliberately grounded at approximately 3:00 a.m. on June 6, 1993 off the coast of the Gateway Recreational Area in Queens, New York, and in the ensuing pandemonium at least ten people died of hypothermia or drowning. Because four of the bodies were discovered only later, Lee was charged with the six known deaths.

We have already affirmed the convictions of Lee's co-conspirators in three cases, familiarity with which is assumed. *See United States v. Moe*, 65 F.3d 245 (2d Cir.1995); *United States v. Kin Sin Lee*, 122 F.3d 1058 (2d Cir.1995) (summary order affirming the unreported sentencing of one of Lee's co-conspirators, *see* 1995 WL 595065 (2d Cir. Sept.11, 1995)); *United States v. Hui*, 83 F.3d 592 (2d Cir.1996) (per curiam). We affirm Lee's conviction as well, and write because convicting Lee, the smuggling operation's leader, marks the end of this cruel saga, and also because of public concern with the growing trade in illegal immigration and with those like this defendant who profit hugely from it.

## BACKGROUND

### I Facts

In early 1992 Lee contacted Weng Yu Hui, an alien smuggler or "snakehead," asking him to provide Chinese nationals to be smuggled to the United States. Lee expected to be paid $15,000 for each person smuggled. The original plan called for the Chinese passengers to travel on a ship called the *Nadj II* from Thailand to the United States, but that ship was forced to moor off the coast of Kenya while its 300 passengers were stranded on board with inadequate food and supplies for five months. Lee admits that during this time, the *Nadj II*'s life preservers were sold to buy food and other necessities.

Defendant then orchestrated the purchase and refitting of a second ship, the *Golden Venture*, which arrived from Singapore to pick up the stranded passengers off the coast of Kenya. Though the *Golden Venture* was a cargo ship not licensed to carry passengers, it was already carrying between 90 and 100 Chinese nationals when it arrived in Africa where some 200 of the *Nadj II*'s passengers joined them to continue their voyage to the United States on the *Golden Venture*.

Once aboard, the passengers were confined to a 20 foot by 40 foot cargo hold that had only one ladder leading to the deck. Water and food were severely rationed, and there was no water for personal hygiene. The ship had only one toilet, the use of which was restricted to the crew, the Chinese managers of the venture, and the few women passengers on board. It had no life preservers and only two lifeboats, which in turn were adequate to carry only the (unusually small) crew of 14. Passengers who questioned the arrangements were beaten. The 298 passengers spent between three and six months (depending whether they had boarded in Asia or in Kenya) on the ship as it wended its way to the United States.

Lee, who was then in New York, had hoped initially that he could arrange for small boats to rendezvous with the *Golden Venture* in the Atlantic to pick up the passengers and transport them to shore. When this plan fell through, he instructed the *Golden Venture* to approach the New York harbor. Defendant ordered Kin Sin Lee, whom he had hired to travel on the *Golden Venture* and oversee its day-to-day operations, via ship-to-shore radio, to ground the ship at full speed in the dead of night off the coast of Rockaway Point in Queens. Lee also told Kin Sin Lee to tell the passengers that those who could swim should jump off the ship and swim ashore when the boat was grounded, while the others should wait for someone to pick them up. No other arrangements were made for disembarking the passengers.

Beginning about midnight on June 6, 1993, the crew began its efforts to ground the ship. After twice beginning to speed for the shore and then realizing that the location was unsuitable, the ship finally picked a spot on the ocean or surf side of Rockaway Point and at about 3:00 a.m. ran the ship aground. The passengers' only warning that the ship was being grounded had been given some 12 hours earlier, when they were told to brace themselves. Chaos ensued. Some passengers jumped into the rough water, which was below 60F, and ten of them, as earlier noted, drowned or died of hypothermia.

## II Proceedings in the Trial Court

Lee pled guilty to three counts on March 11, 1998: conspiracy to smuggle aliens, 18 U.S.C. § 371, smuggling aliens, 8 U.S.C. § 1324(a)(1), and seaman's manslaughter, 18 U.S.C. § 1115. He does not challenge the first two convictions. On December 1, 1998 the United States District Court for the Eastern District of New York (Raggi, J.) convicted Lee of violating § 1115. That section provides in relevant part

> Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined ... or imprisoned not more than ten years, or both.

After his plea allocution, Lee submitted papers to the district court contending, among other things, that he had not correctly described the events leading up to the *Golden Venture*'s grounding. The trial court held an evidentiary hearing on these assertions and on Lee's related motion to withdraw his guilty plea. The only factual argument defendant presses on appeal is that he did not, in fact, instruct the

ship to ground on the *ocean* or surf side of Rockaway Point. Rather, Lee testified at the post-allocation hearing, he had told those in charge of the ship to ground it on the *bay* side. He said that he made this distinction because he had visited the area and observed that the bay side was sandy, rather than rocky, and that the water on the bay side was much calmer. Lee did not present any other evidence as to the relative safety of the two locations. The district court explicitly found this testimony not credible and found, in addition, with respect to a requested sentencing enhancement for obstruction of justice, that the distinction between the two locations was not material.

Lee was thereupon sentenced to a five-year term on each of the alien smuggling counts and to ten years on the manslaughter count. These sentences were imposed consecutively to make a total of 20 years' imprisonment. The ten-year manslaughter sentence represented a substantial upward departure from the 33–month upper limit of the Sentencing Guideline range. Lee appeals both his conviction and sentence for manslaughter.

## DISCUSSION

### I Conviction

█ We discuss defendant's conviction and sentence in order. Lee contends on appeal, as he did in the district court in an effort to withdraw his guilty plea, that there is no adequate factual support for his guilty plea to seaman's manslaughter under 18 U.S.C. § 1115. His argument has two prongs: first, he insists that the facts as allocated do not support conviction; and second, he avers that the "true" facts, presented to the trial court in papers and at a hearing after the allocution, do not support conviction. The distinction Lee makes is that in the second or what he calls the "true" version of what happened, his order to the *Golden Venture* was that it be beached on the bay side of Rockaway Point. Defendant declares that the facts

do not support conviction because he was not responsible for the passengers' decision to jump into the freezing water, and that he was therefore not directly responsible for their deaths. In addition, he maintains that a "mutiny" on board the *Golden Venture* on May 17, 1993 had deprived him of control of the ship.

We dispose of the "mutiny" argument first. As we explained in *Moe*, 65 F.3d at 248, the purpose and effect of the mutiny was to reinforce, not to lessen, Lee's control of the ship. A disagreement had developed between the ship's captain, who wanted to stop at Madeira and perhaps hold one of Lee's employees hostage until small ships were sent for a mid-Atlantic rendezvous, and Lee's subordinate Kin Sin Lee, who wanted to continue on to the United States. Kin Sin Lee and the other Chinese managers successfully seized control of the ship and remained in contact with Lee, who was their leader.

With respect to the challenge regarding the location for grounding, we agree with the trial court that found any distinction between the ocean and bay side of Rockaway Point was not material. Lee was responsible for the inhumane conditions that deprived his passengers of adequate water, food, sanitation, and opportunity for exercise for weeks on end. He knew that the *Golden Venture* lacked life preservers and life boats. Yet, he ordered the ship to ground at full speed in the dead of night in an area with water temperatures below 60F, and ordered the crew to tell the passengers that those who knew how to swim should jump overboard. The passengers were not even warned of the time of impact, and there was no plan or equipment to evacuate them safely.

Thus, regardless of whether the beach was sandy or rocky at the point of impact, the multiple deaths that in fact occurred were an entirely foreseeable result of Lee's arrangements and orders to his subordinates. The district court correctly discerned an adequate causal nexus for conviction under 18 U.S.C. § 1115. *See Hui*, 83 F.3d at 594 ("the intentional grounding of the ship made it not only foreseeable, *but likely,* that deaths would result") (emphasis added); *Van Schaick v. United States,* 159 F. 847 (2d Cir.1908) (applying a predecessor of § 1115); *Hoopengarner v. United States,* 270 F.2d 465, 469 (6th Cir. 1959) ("Where it reasonably might or should have been foreseen by appellant that the commission of his act would be likely to create a situation which would expose another to the danger of injury or death, [even] at the hand of a non-participant in such reckless conduct, the creation of such dangerous situation is to be regarded as the proximate cause of the death of the innocent person."); *see generally United States v. Guillette,* 547 F.2d 743, 749 (2d Cir.1976) (discussing proximate cause in criminal context).

## II Sentence

Lee further contends that the district court erred in sentencing him because it incorrectly found his testimony not to be credible and because it did not adequately consider lesser levels of punishment before sentencing him to the statutory maximum. These contentions are meritless.

We affirm a departure from the sentencing guidelines if (1) the district court's stated reasons for departure, reviewed *de novo,* are of a kind or a degree not adequately considered by the sentencing commission and that may appropriately be relied upon to justify the departure; (2) the factual findings underlying the reasons are not clearly erroneous; and (3) the extent of the departure is reasonable, giving due deference to the sentencing court. *See Hui,* 83 F.3d at 594; *United States v. Tropiano,* 50 F.3d 157, 162 (2d Cir.1995). The trial court's finding that Lee's testimony was not credible in his partial recantation of his plea allocution was not clearly erroneous. In any event, Lee admitted three of the four facts on which the upward departure was based and did not later challenge any of them.

Judge Raggi had previously sentenced Lee's co-conspirators to the statutory maximum for each count, *see Hui*, 83 F.3d at 594; *Kin Sin Lee*, 122 F.3d 1058, 1995 WL 595065 at *1, or to the statutory maximum less a downward departure for cooperation with the government, *see Moe*, 65 F.3d at 250–51. We have affirmed these sentences. We affirm here on the same grounds. The sentencing court's stated reasons for the upward departure included all four factors identified in the relevant sentencing guideline: dangerous or inhumane treatment; death of at least six individuals and the bodily injury of many others; the involvement of 298 aliens, *i.e.*, substantially more than 100 aliens; and possession of dangerous weapons (by Lee's employees on board the *Golden Venture* ). *See* U.S.S.G. § 2L1.1, app. n.5 (1992); *Hui*, 83 F.3d at 594. These are valid reasons for the departure. We find no error in the underlying factual findings, and the departure was reasonable.

Nor did the district court err by not proceeding step-by-step through every possible sentence before sentencing defendant to the statutory maximum. We have established that such a step-by-step procedure is not necessary for offense level ("vertical") departures. *See Tropiano*, 50 F.3d at 163; *United States v. Mandel*, 991 F.2d 55, 57–58 (2d Cir.1993). In the present case, the district court considered the facts that defendant was the leader of this inhumane venture, the person who orchestrated and financed it and who gave a direct order to his employees aboard the ship to ground it. As a consequence, the upward departure in Lee's sentence reflected a careful and reasoned application of the sentencing guidelines.

## CONCLUSION

For the reasons above stated, we affirm Lee's conviction and his sentence.