**UNITED STATES of America,**

**v.**

**Joseph MITLOF, and Daniel Sheehan, Defendants.**

**No. 01 CR 466(CM).**

United States District Court, S.D. New York.

Sept. 20, 2001.

William C. Silverman, Assistant United States Attorney.

R. Scott Thompson, Esq., Lowenstein Sandler, PC, Roseland, NJ, for Joseph Mitlof.

Patrick Burke, Burke, Miele & Golden, Suffern, NY, for Daniel Sheehan.

DECISION AND ORDER DENYING DEFENDANT MITLOF'S PRETRIAL MOTIONS

MCMAHON, District Judge.

The charges in this case arise from the ill fated voyage of a boat named the "Conservator," which was owned by defendant Joseph Mitlof and captained by defendant Daniel Sheehan. On August 23, 1998, the Conservator—a tri hull, three open pontoon flat deck vessel—capsized on the Hudson River while ferrying passengers from Nyack to Tarrytown. One passenger, an eighty-six year-old man, died in the water.

In indictment 01 Cr. 466, filed with the Court on May 11, 2001, Mitlof and Sheehan are charged with violating the manslaughter statute applicable to owners, charters, and captains of vessels, in violation of Title 18, United States Code section 1115, and with conspiring to violate the so-called "Seaman's Manslaughter Act" in violation of the federal general conspiracy statute, 18 U.S.C. § 371. Mitlof is separately charged, in the same indictment, with wire fraud in connection with false advertisement over the Internet. On September 17, 2001, the Government filed a superseding indictment; it made no changes in the charges material to the pending motions.

Defendant Mitlof has filed a motion seeking dismissal of counts one and three, the conspiracy and manslaughter counts in which he is named. Defendant also asks that the Court issue an order directing the Government to provide defendant with a bill of particulars and additional discovery.

Factual Allegations of the Government

The Government sets forth the following factual allegations in the indictment in support of the manslaughter and conspiracy counts:

Joseph Mitlof was the owner of Hudson Valley Waterways, a business that provided water taxi service and tour service in 1998 on the Hudson River operating out of Tarrytown, Piedmont, Nyack, Ossining and Haverstraw, New York. Daniel Sheehan was a licensed U.S. Merchant Marine Officer employed by Hudson River Waterways to captain vessels on the Hudson River.

Federal regulations mandate that any vessel carrying more than six passengers, including at least one for hire, may only be operated if it has on board a valid United States Coast Guard ("Coast Guard") certificate of inspection ("COI"). The COI must include, among other things, the routes the vessel is permitted to travel and the maximum number of passengers it is permitted to carry. If there is any change in the character of the vessel or in its route, equipment, ownership or operation, the owner is required to request an amended COI from the Coast Guard. *See* 46 Code of Federal Regulations §§ 176.100, 176.103, 175.110 & 176.120.

Mitlof purchased the Conservator in July 1998 from the Norwalk Aquarium, which had used the vessel for a short educational trips on the Norwalk River. On August 22, 1998, while being piloted by Sheehan, the Conservator took on water while carrying 12 passengers on the Hudson River. On August 23, 1998, the Conservator embarked on another voyage along the Hudson River, this time carrying 29 passengers, more than were permitted under the Norwalk COI. A few minutes into the voyage, the Conservator once again began to take on water. It then capsized, resulting in the drowning death of one of its passengers, Dr. Milton Salkind.

At the time of its purchase, the Conservator was certified by the Coast Guard (i) for limited use in the Norwalk, Connecticut Harbor area, (ii) to carry no more than 20 passengers and (iii) to be used not more than one mile from shore, on voyages not to exceed 30 minutes in duration. Unlike the Norwalk Connecticut Harbor area, which is a placid body of water, the Hudson River is subject to tidal conditions, high winds and strong currents. In the vicinity of the Tappan Zee Bridge, where the Hudson Valley Waterways operated, the river is over two miles wide as compared to the Norwalk River, which is less than a mile across.

The Government alleges that Mitlof knew he was required to obtain an amended COI from the Coast Guard before he could operate the Conservator as part of a water taxi service in the Hudson River. As evidenced it cites defendant's unsuccessful attempt to have another of his vessels, the "Aaron Burr," re-certified by the Coast Guard for use in the Tappan Zee Bridge area of the Hudson.

Aside from lacking a valid COI to operate as a water taxi on the Hudson River, the Government contends that the Conservator was physically unfit to carry passengers on the Hudson. According to the indictment, the Conservator had numerous mechanical and structural deficiencies, such as: improper electrical wiring; faulty pumps and valves (which permitted the build-up of water in the vessel); pontoons that were not watertight; and life preservers in poor condition (some of them with straps knotted together). Post accident reports by the Coast Guard and the New York State Police detail the vessel's poor condition.

### *Defendant Mitlof's Challenge to the Indictment*

Mitlof moves for dismissal of all charges except Count IV, which charges him with wire fraud. He seeks dismissal of count III by challenging the constitutionality of § 1115, arguing that it is both vague and over broad. He contends that count I, conspiring to violate § 1115, must be dismissed because it is not possible to conspire to commit manslaughter.

1. *The Motion to Dismiss Count III of the Indictment is Denied.*

■ Defendant's challenge to the constitutionality of the "Seamans Manslaughter

Statute" is without merit. Title 18, United States Code, section 1115 provides that:

> Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.
>
> When the owner or charterer of any steamboat or vessel is a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.

Defendant contends that this statute is unconstitutionally vague. He relies primarily on *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). *Morales* involved a city ordinance that allowed a police officer to order any person whom the officer reasonably believed to be a "gang member loitering in any public place" to disperse. *Id.* at 47, 119 S.Ct. 1849 If that person failed to obey the order to leave, he was guilty of a crime. *Id.* The Court found the ordinance to be unconstitutional in that it contained no *mens rea* requirement and infringed on constitutionally protected rights. *Id.* at 55, 119 S.Ct. 1849. The Court held that the ordinance reached a "substantial amount of innocent conduct," and conferred "vast discretion on police." *Id.* at 60–61, 119 S.Ct. 1849.

Section 1115 is nothing like the anti-loitering ordinance challenged in *Morales.* Because Section 1115 implicates no constitutionally protected conduct, such as the right to assemble, defendant's vagueness challenge must be examined in light of the facts of the particular case. *See United States v. Whittaker,* 999 F.2d 38, 42 (2d Cir.1993); *United States v. Nadi,* 996 F.2d 548, 550 (2d Cir.1993). Such a statute can be struck down "only if the enactment is impermissibly vague in all of its applications." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 489, 495, 102 S.Ct. 1186. I cannot say that of Section 1115.

The Court asks two questions to determine whether a statute is impermissibly vague in all its applications. First, does the statute give the person of ordinary intelligence a reasonable opportunity to know what is prohibited? Second, does it provide explicit standards for those who apply it? *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Whittaker,* 999 F.2d at 42; *Nadi,* 996 F.2d. at 550. A statute is not unconstitutionally vague if the criminal offense is defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender,* 461 U.S. at 357, 103 S.Ct. 1855.

The statute, as applied to defendant Mitlof, requires that a loss of life result from "an owner's fraud, neglect, connivance, misconduct, or violation of law." 18, U.S.C. § 1115. The indictment alleges that defendant's conduct with respect to his operation of the Conservator as a water ferry caused the death of passenger Dr. Salkind.

Among the allegations are that: defendant operated the Conservator as a water taxi even though he knew the vessel did not have a valid COI from the Coast Guard; defendant was aware that the vessel was not suited for commercial use on the Hudson River; defendant was aware that the Conservator had serious mechanical and structural problems which rendered the boat unsuitable for ferry service; and defendant knew the Conservator had either too few life saving vests or vests that were otherwise rendered ineffectual.

Accepting what is alleged in the indictment as true, a person of ordinary intelligence would clearly understand from reading the statute that Mitlof's behavior violated section 1115.

Defendant's assertion that the connecting phrases of section 1115 renders the statute "undeniably vague" is belied by the recent Second Circuit opinion in *United States v. Fei,* 225 F.3d 167, 171 (2d Cir. 2000). In *Fei,* the Court upheld defendant's guilty plea to section 1115 after discussing proximate cause with respect to that statute. *Id.* The connecting phrases did not deter the *Fei* Court from finding a causal relationship between that defendant's actions and the conduct proscribed under section 1115.

While section 1115 (a law which, in one form or another, has existed since the nineteenth century) is not the most artfully drafted statute, and employs somewhat archaic phraseology, it is not so ambiguous that a person of ordinary intelligence would have a problem reading the statute and understanding what activity was proscribed. Indeed, "some ambiguity in a statute's meaning is constitutionally tolerable," and " 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.' " *United States v. Chestaro,* 197 F.3d 600 (2d Cir. 1999) (quoting *Chapman v. United States,* 500 U.S. 453, 464, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)), *petition for cert. filed,* 530 U.S. 1245, 120 S.Ct. 2694, 147 L.Ed.2d 965 (2000).

Section 1115 is constitutional, and the motion to dismiss Count Three is denied.

2. *The Motion to Dismiss Count I of the Indictment is Denied*

A far more difficult question is raised by Mitlof's contention that Count I of the indictment must be dismissed because it charges conspiracy to commit an act of negligence. At least in the context of Section 1115, this appears to be a question of first impression in any court. In fact, neither the Government, the defense, nor the Court has been able to identify a single instance in which the Government has charged a defendant with conspiracy to violate this statute.[1]

The gravamen of Section 1115 is homicide caused by misconduct, negligence or inattention to duty. Significantly, the Federal Criminal Code does not make it a crime to operate a vessel in a negligent manner; negligence only rises to the level of criminality if someone dies as a result.

1. While prosecutions under Section 1115 are rare, as recently as last year, the United States Court of Appeals for the Second Circuit had occasion to consider an appeal from a conviction for a substantive violation of the statute. *United States v. Fei,* 225 F.3d 167 ( 2nd Cir.2000). In *Fei,* case, a number of individuals, working together to smuggle Chinese immigrants into the United States, were charged substantively under Section 1115 following the death of some of the immigrants who were being carried on the "Golden Venture," an unseaworthy vessel. *United States v. Fei,* 225 F.3d at 167. No conspiracy was charged in that case. Mitlof points out that, of the 22 reported cases that involve a prosecution or conviction under Section 1115 or its predecessor statute, there were no convictions for conspiracy to violate the statute—only for substantive violations of the statute.

Count I of the Indictment charges Mitlof and Sheehan with conspiring to violate this statute in the following manner:

> 17. It was a part and an object of the conspiracy that DANIEL SHEEHAN, the defendant, as captain of the Conservator, and JOSEPH MITLOF, the defendant, as owner and charterer of the Conservator, and others known and unknown, unlawfully, wilfully and knowingly would and did engage in misconduct, negligence and inattention to the captain's duties on such vessel, by which the life of a person was destroyed, and would and did engage in fraud, neglect, connivance, misconduct and violation of law, through which the life of a person was destroyed, to wit, MITLOF, SHEEHAN and others agreed to have the Conservator carry passengers on the Hudson River, as part of a commercial ferry service, despite the fact that the vessel was not registered, certified or fit to operate on the Hudson River, thereby resulting in the death of a passenger on August 23, 1998, in violation of Section 1115 of Title 18, United States Code.

The Indictment identifies three overt acts allegedly committed in furtherance of this conspiracy: Mitlof's causing the Conservator to carry passengers on the Hudson River, Mitlof's falsely advertising that his Hudson River water taxi service and tour business operated Coast Guard certified vessels, and Sheehan's serving as captain of the ill-fated voyage (Ind.¶ 18).

Mitlof argues that Count I must be dismissed because it charges conspiracy to bring about an unintended consequence, which, he urges, is legally and logically impossible. Specifically, he argues that a conspiracy to violate Section 1115 "would require an agreement in advance to act negligently or recklessly, and thereby cause an unintentional death." (D. Brief at 8). Put otherwise, he contends that he would have to have agreed in advance to cause a passenger's death in order for this Count to stand.

In support of his argument, Mitlof marshals an impressive array of support.

*First,* numerous state courts have held, under their respective state laws, that it is not possible to conspire to achieve an unintended consequence. *Palmer v. People,* 964 P.2d 524 (Colo.1998)(conspiracy to commit reckless manslaughter not a crime); *State v. Beccia,* 199 Conn. 1, 505 A.2d 683, 685 (1986) (impossible to agree to cause damage to a building recklessly); *State v. Toczko,* 23 Conn.App. 502, 582 A.2d 769 (1990)(agreement to cause an unintentional result a logical impossibility); *State v. Baca,* 124 N.M. 333, 950 P.2d 776 (1997) (reversing conviction for "depraved heart murder," which does not require intent to kill, but only recklessness); *People v. Swain,* 49 Cal.Rptr.2d 390, 909 P.2d 994 (1996)(not possible to conspire to commit "implied malice murder," which does not require intent to kill); *Conley v. State,* 146 Ga.App. 739, 247 S.E.2d 562 (1978) ("one cannot conspire to kill another in the heat of passion").

*Second,* an impressive array of commentators have concluded, because conspiracy is a specific intent crime, that it is not possible to conspire to commit a crime that results from an unintended consequence. For example, Professor LaFave, in his authoritative commentary on Criminal Law, rejected such an argument as follows:

> The fact that conspiracy requires an intent to achieve a certain objective means that individuals who have together committed a certain crime have not necessarily participated in a conspiracy to commit that crime.... It follows, therefore, that there is no such thing as a conspiracy to commit a crime which is defined in terms of recklessly or negligently causing a result.... Thus even if

what was done under an agreement has been made unlawful on a liability without fault basis, there can be no conviction for conspiracy unless it is shown that the parties actually intended to achieve what was done. This is as it should be, for the fact that a statute has made the doing of a certain act an offense without regard to mental fault can hardly be said to have worked a change in the mental element of the distinct crime of conspiracy.

Robert La Fave, *Criminal Law,* Section 580–581, 583, 3d ed. (2000). And the American Law Institute, in its Commentary to the Model Penal Code, explicitly recognized as follows:

> When recklessness or negligence suffices for the actor's culpability with respect to a result element of a substantive crime, as for example when homicide through negligence is made criminal, there could not be a conspiracy to commit that crime. This should be distinguished, however, from a crime defined in terms of conduct that creates a risk of harm, such as reckless driving or driving above a certain speed limit. In this situation the conduct rather than any result it may produce is the element of the crime, and it would suffice for guilt of conspiracy that the actor's purpose was to promote or facilitate such conduct.

Model Penal Code § 5.03 cmt. 2(c)(i) at 408 (Official Draft and Revised Comments 1985). Here, of course, the statute Mitlof and Sheehan are accused of conspiring to violate is of the former, rather than the latter variety: that is, the statute criminalizes otherwise non-criminal conduct if, and only if, that conduct unintentionally results in death. Thus, if the Model Penal Code governed, the crime charged in Count I of the Indictment would not be a crime at all.[2]

*Third,* Federal Courts considering the issue in civil cases have dismissed the idea that one can conspire to act unintentionally as a logical impossibility. *Wright v. Brooke Group Ltd.,* 114 F.Supp.2d 797, 836 (N.D.Iowa 2000)(there can be no conspiracy to be negligent—that is, to intend to act negligently); *Haskin v. R.J. Reynolds Tobacco Co.,* 995 F.Supp. 1437, 1440 (M.D.Fla.1998)(no civil conspiracy to commit reckless or negligent acts because they are unintended); *Sackman v. Liggett Group Inc.,* 965 F.Supp. 391, 394 (E.D.N.Y.1997)(same); *Sonnenreich v. Philip Morris, Inc.,* 929 F.Supp. 416 (S.D.Fla.1996) (conspiracy to commit negligence is a non sequitur); *Rogers v. Furlow,* 699 F.Supp. 672, 675 (same); *Campbell v. A.H. Robins Co., Inc.,* 615 F.Supp. 496, 500 (W.D.Wis.1985) (same in strict liability context).

The Government says not so. Noting (1) that a conspiracy requires proof of two distinct mental states, one associated with the agreement and the other with the criminal object, *United States v. Gypsum Co.,* 438 U.S. 422, 443 n. 20, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *United States v. Ferrarini,* 219 F.3d 145, 154 (2d Cir.2000); and (2) that different elements of the same offense can require different mental states, *Staples v. United States,* 511 U.S. 600, 609, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); it argues that the mental state required for the object of the conspiracy is derived from, and therefore the same as, the mental state required to commit the underlying substantive offense. For this proposition, it relies on *United States v. Feola,*

2. While the Model Penal Code has not replaced the United States Code, the Second Circuit recently relied on its commentary in another context. *United States v. Cohen,* 260 F.3d 68, 71 (2d Cir.2001).

420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

*Feola* is factually dissimilar to this case. Of particular importance, it does not charge a defendant with conspiracy to commit negligence, which is the gravamen of Count I in this Indictment. In *Feola* three individuals were charged with assaulting federal officers and conspiracy to assault federal officers. There appeared to be no question that the defendants were unaware, at the time they assaulted their victims, that the individuals under attack were federal officers. Therefore, while defendants knew they were assaulting someone, they had no idea they were assaulting federal officers. Defendants argued that they could not be convicted of conspiring to assault federal officers when they did not know that was what they were planning to do.

The Supreme Court, voting 7–2, rejected the defendants' argument. Noting that one could be guilty of assault on a federal officer without being aware that the victim was a federal officer, the Court "declined to require a greater degree of intent for conspiratorial responsibility than for responsibility for the underlying substantive offense." *United States v. Feola,* 420 U.S. at 688, 95 S.Ct. 1255. The Court summarized its ruling as follows:

> We hold here only that where a substantive offense embodies only a requirement of *mens rea* as to each of its elements, the general federal conspiracy statute requires no more.

*Id.* at 692, 95 S.Ct. 1255.

The Supreme Court relied heavily on the text of the general federal conspiracy statute The Supreme Court said:

> The general conspiracy statute, 18 U.S.C. § 371, offers no textual support for the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law. The statute makes it unlawful simply to "conspire. . . . to commit any offense against the United States." A natural reading of these words would be that since one can violate a criminal statute simply by engaging in the forbidden conduct, a conspiracy to commit that offense is nothing more than an agreement to engage in the prohibited conduct. Then where, as here, the substantive statute does not require that an assailant know the official status of his victim, there is nothing on the fact of the conspiracy statute that would seem to require that those agreeing to the assault have a greater degree of knowledge.

*United States v. Feola,* 420 U.S. at 687, 95 S.Ct. 1255.

The Government then cites to several post-*Feola* cases in which courts sustained convictions for conspiracy to violate various statutes where the mental state for the object of the conspiracy was, not intent, but the same as the mental state for violation of the underlying substantive offense. *United States v. Eisenberg,* 596 F.2d 522, 525 (2d Cir.1979); *United States v. Rosa,* 17 F.3d 1531, 1544–45 (2d Cir.1994); *United States v. Gurary,* 860 F.2d 521, 524 (2d Cir.1988); *United States v. Viruet,* 539 F.2d 295, 297 (2d Cir.1976), *United States v. Green,* 523 F.2d 229, 233–34 (2d Cir. 1975). Only one of those cases involved conspiracy to do a negligent act, and in that case—*United States v. Thomas,* 887 F.2d 1341 (9th Cir.1989)—and even that case can be distinguished from this one, since in *Thomas,* the Ninth Circuit concluded that the defendant could be convicted of agreeing to do an act that he should have known was *illegal. Thomas,* supra., 887 F.2d at 1347. The act that Thomas is alleged to have conspired to commit—taking an elk without a properly-issued hunting permit and transporting it in interstate

commerce (a violation of the Lacey Act, 16 U.S.C. § 3372(a)(2)(A) and 3373(d)(2)is illegal); and the defendant, a duly licensed hunting guide who had passed a test on Montana hunting law before being licensed, knew that it was illegal.[3] Here, the overt acts identified in the indictment—operating a ferry without proper Coast Guard certification and advertising the same—are not in and of themselves criminal acts, so the defendants could not have known that they were "illegal" (i.e., criminal).

The Ninth Circuit's opinion in *Thomas* has been much criticized, especially for its incomprehensible conclusion that Thomas was guilty, "not of conspiring to be negligent, but of negligently conspiring." *United States v. Thomas,* 887 F.2d at 1347. Still, it does stand for the proposition that one can be guilty of conspiring to violate a federal substantive statute that criminalizes negligent conduct.

One could easily decide this motion, and by-pass defendant's highly persuasive authorities, by relying on the literal words of *Feola.* The general conspiracy statute makes it unlawful to conspire (agree) to commit *any* offense against the United States. Section 371 carves out no exception for offenses with a *mens rea* of negligence or recklessness. It is an offense against the United States to cause the death of any person by misconduct, negligence or inattention to duty on board a steamboat or vessel. Thus, under the literal terms of the general conspiracy statute, it is possible to conspire to commit that statute.

However, Mitlof contends that the simplistic *Feola* analysis begs the question, because the gravamen of the underlying offense—the conduct actually forbidden by Section 1115—is causing a homicide, not negligence on the navigable waters of the United States. He claims that there is no suggestion that Mitlof and Sheehan ever agreed to cause a passenger to lose his life. He argues that his case is not governed by *Feola,* because Feola expressly left open a question that I cannot avoid:

> whether it is fair to punish parties to an agreement to engage intentionally in "apparently innocent conduct" where the unintended result of engaging in that conduct is the violation of a criminal statute.

*United States v. Feola,* 420 U.S. at 691, 95 S.Ct. 1255.

For Mitlof to convince me to consider this open question, he would have to convince me that his alleged misconduct—that is, the negligent operation of the Conservator and his advertising the vessel as Coast Guard certified when it was not—was "apparently innocent conduct." Mitlof reminds this Court that the overt acts charged in the Indictment are not themselves crimes, and contends that non-criminal acts—even though they might be expected to subject him to civil liability—are "apparently innocent conduct." The Government urges me to conclude that there is

3. On the reported facts, it appears that Thomas could have been charged and convicted of a violation of Section 16 U.S.C. § 3372(a)(2)(A) and § 3373(d)(1) of the Lacey Act, which makes it a felony to knowingly transport, receive or acquire in interstate commerce any wildlife knowingly taken, possessed or transported in violation of any law or regulation of any state. There appears to be no question that Thomas knew he was violating Montana law by allowing his client to use someone else's hunting license. This suggests a measure of prosecutorial discretion in the decision to charge him under §§ 3372(a)(2)(A) and 3373(d)(2), which makes it a misdemeanor for a person to knowingly transport, receive or acquire in interstate commerce any wildlife, if in the exercise of due care that person should have known that the wildlife was taken, possessed or transported in violation of Montana law—a negligence standard.

nothing "innocent" about a deliberate decision to operate a structurally damaged ferry without a proper license, in waters for which this type of vessel was never designed.

Summarizing the competing arguments in this fashion clarifies what the decision on the motion to dismiss count I must be. A decision about whether Mitlof's conduct was "apparently innocent" (which would indeed open up the question reserved in *Feola*) cannot be made on a motion to dismiss the indictment for facial insufficiency. First, it is well settled that an act innocent in and of itself can satisfy the "overt acts" requirement of the federal conspiracy statute. Second, assuming arguendo that the no-criminal overt acts specified in the indictment are "apparently innocent," the jury will be free to find that an act not specified in the indictment was an overt act committed in furtherance of the alleged conspiracy. *United States v. Shaoul,* 41 F.3d 811, 814 (2d Cir.1994). Therefore, it is more properly made in the context of a motion for a judgment of acquittal at the close of the Government's case, under Fed.R.Crim.P. 29.

As this issue will no doubt resurface during the trial, I am constrained to make several observations, in the hope that the parties will do further (and creative) research on the matter.

First, it is by no means apparent to this Court that "apparently innocent conduct" is synonymous with "criminal" conduct, as urged by Mitlof. The *Feola* court talked about "wrongful" and "legitimate" conduct's becoming unlawful solely because of some factor extraneous to the conduct—there, the identity of the victim; here, the unintended death that allegedly resulted from Mitlof's and Sheehan's negligence. *United States v. Feola,* 420 U.S. at 685, 95 S.Ct. 1255. Actions can be "wrongful" or "illegitimate" without being criminal—viz., the non-criminal overt act.

However, this neat linguistic observation, standing alone, is unlikely to persuade me that the Government should prevail on a Rule 29 motion. The fact is, every case cited by either side, the substantive crime that the defendant was accused of conspiring to commit were crimes in and of themselves—or, to use language from *Feola,* were acts that were "*outlawed* without regard to [the actor's] intent to accomplish the result that is made criminal." *United States v. Feola,* 420 U.S. at 692, 95 S.Ct. 1255 (emphasis added). In *Feola,* the underlying act was criminal assault. In *Thomas,* it was criminal taking of an animal. In *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), it was the illicit possession of hand grenades. In *United States v. Chagra,* 807 F.2d 398 (5th Cir.1986), it was the reckless murder of a federal judge. In *United States v. Karr,* 742 F.2d 493 (9th Cir.1984), it was receipt of stolen explosives. In *United States v. Crimmins,* 123 F.2d 271 (C.A.2 1941) it was trafficking in stolen securities. Thus, in every case, the parties to the conspiracy agreed to commit an act that was criminal, regardless of such extraneous but jurisdictionally fascinating factors as who the victim happened to be.

The facts of this case, as made known to me by two able attorneys, are very different. From what I know thus far, it does not appear that Mitlof and Sheehan agreed to do any "outlawed" thing without regard to their intent to accomplish the result that made their actions criminal—in this case, the death of a passenger after a ferry accident. The Government has not yet apprised me that it intends to put on any evidence suggesting that defendants intended to accomplish "the result that made their actions criminal."

In dictum discussing the question it had no need to answer, the *Feola* court made the following observation:

> The *Crimmins* rule [4] rests upon another foundation: that it is improper to find conspiratorial liability where the parties to the illicit agreement were not aware of the fact giving rise to federal jurisdiction, because the essence of conspiracy is agreement and persons cannot be punished for acts beyond the scope of their agreement. 123 F.2d at 273. This 'reason' states little more than a conclusion, for it is clear that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement. *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). *The question is not merely whether the official status of an assaulted victim was known to the parties at the time of their agreement, but whether the acts contemplated by the conspirators are to be deemed legally different from those actually performed solely because of the official identity of the victim. Put another way, does the identity of the proposed victim alter the legal character of the acts agreed to, or is it no more germane to the nature of those acts than the color of the victim's hair?*

*United States v. Feola,* 420 U.S. at 692–93, 95 S.Ct. 1255 (Emphasis added).

To pose the highlighted question in this case, we need only substitute the words "consequence of the alleged negligence" for the words "official identity of the victim." The question, as put by the *Feola* Court, is whether the acts contemplated by the conspirators are to be deemed legally different from those actually performed solely because of their unintended (but possibly not unforeseen) criminal consequences. Understanding that the statement quoted above is dictum, the Supreme

4. In *United States v. Crimmins,* 123 F.2d 271 (C.A.2 1941), the defendant was found guilty of conspiring to receive stolen bonds that had been transported in interstate commerce. The Court of Appeals, reversing the conviction, pointed out that the evidence failed to establish that Crimmins actually knew the stolen bonds had moved into the State. Judge Learned Hand, accepting that proof of anti-federal intent was not necessary for a conviction under the substantive offense, nonetheless concluded that "to permit conspiratorial liability where the conspirators were ignorant of the federal implications of their acts would be to enlarge their agreement beyond its terms as they understood them." *Id.* In an attempt to clarify the distinction, Judge Hand provided what has been come to be known as the "traffic light analogy":

> While one may, for instance, be guilty of running past a traffic light of whose existence one is ignorant, one cannot be guilty of conspiring to run past such a light, for one cannot agree to run past a light unless one supposes that there is a light to run past.

*Id.* at 273. At least until *Feola, Crimmins* was good law in this Circuit (though not in others).

The question left open in *Feola*—whether it is fair to punish parties to engage intentionally in "apparently innocent conduct" where the unintended result of engaging in that conduct is the violation of a criminal statute—is ostensibly the one posed by the traffic light analogy. The *Feola* court, while not reaching the issue, at least hinted at how it might answer that question in the appropriate context, noting that the *Crimmins* rule came close to stating "what has been known as the 'Powell doctrine,' originating in *People v. Powell,* 63 N.Y. 88 (1875)." *United States v. Feola,* 420 U.S. at 691, 95 S.Ct. 1255. Under the *Powell* doctrine, a conspiracy is criminal only if it is animated by a corrupt motive or a motive to do wrong. Since only two months ago, the Second Circuit expressly refused to apply the *Powell* doctrine in the Federal criminal conspiracy context, *United States v. Cohen,* 260 F.3d 68, 71 (2d Cir.2001), it is possible that whatever was left of Judge Hand's opinion in *Crimmins* by the *Feola* court has now been foreclosed by the Court of Appeals in *Cohen.*

Court has nonetheless suggested that the distinction it highlights is "a difference that makes a difference." The Government should bear this in mind as it prepares to argue the inevitable Rule 29 motion.

3. *Request for Bill of Particulars and Additional Discovery*

It is well settled that the purpose of a bill of particulars is to provide facts supplemental to those contained in an indictment that are necessary to inform a defendant of the charges against him with sufficient precision, (1) to prepare a defense, (2) to avoid unfair surprise at trial, and (3) to preclude a second prosecution for the same offense. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.) *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts which he is accused." *Torres,* 901 F.2d at 234. The ultimate test must be whether the information sought is necessary, not whether it is helpful. *See United States v. Leighton,* 265 F.Supp. 27, 35 (S.D.N.Y.1967), *aff'd,* 386 F.2d 822 (2d Cir. 1967). The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories. *United States v. Wilson,* 565 F.Supp. 1416, 1439 (S.D.N.Y.1983); *United States v. Mannino,* 480 F.Supp. 1182, 1185 (S.D.N.Y.1979), *United States v. Culoso,* 461 F.Supp. 128, 134 & n. 9 (S.D.N.Y.1978), *aff'd without opinion,* 607 F.2d 999 (2d Cir.1979).

In its request for a bill of particulars defendant's asks the Government to (i) to specify which of "fraud, neglect, connivance, misconduct, and violation of law" each of the defendant's was alleged to have committed, (ii) to identify each act of "fraud, neglect, connivance, misconduct, and violation of law" upon which the Government will base its case, and (iii) to identify each act of "fraud, neglect, connivance, misconduct, and violation of law" on the part of each defendant through which it is alleged that the "life of a person was destroyed." Mitlof argues that the indictment "provides no real clue as to what [he] did wrong." The Court disagrees. The indictment contains far more detailed than most cases, and sets forth the charges against defendant with sufficient precision to enable him to prepare his defense and avoid unfair surprise at trial. Accordingly there is no need for a bill of particulars in this case.

What defendant seeks is in the nature of the "wheres, whens and with whoms" that Courts have held to be beyond the scope of a bill of particulars. *See Torres,* 901 F.2d at 233–34 (affirming denial of request for a bill of particulars seeking date defendant joined conspiracy, the identity of coconspirators, and precise dates and locations relating to overt acts); *United States v. Jimenez,* 824 F.Supp. 351, 363 (S.D.N.Y. 1993) (Government may not be compelled to provide a preview of its evidence; motions for "whens," "wheres," and "with whoms" regarding conspiracy are routinely denied). Indeed, defendant is attempting to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars, and can only serve to limit the defendant's proof at trial. *See e.g., United States v. Leonelli,* 428 F.Supp. 880, 882 (S.D.N.Y.1977) (rejecting request for bill of particulars regarding the names, dates and places for the entire case as "an attempt to discover the minutia of the Government's case").

Defendant's reliance on *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987) (per curiam) is misplaced. In *Bortnovsky,* an insurance fraud case, there was serious questions about which documents were alleged to be false, and "[t]he relevance of key events was shrouded in mystery." *Id.* There is no mystery about the charge in this case.

Defendant's motion for a bill of particulars is denied.

Based on the Government's representations in its papers and at oral argument on September 17, 2001, that the Government has provided all discoverable materials in its possession, and that it will work closely with defendant's counsel to resolve any questions regarding discovery, the Court will not issue an order compelling additional discovery.

Similarly, based on the Government representation that it is aware of its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, and that the Government will continue to provide such information to the defendant in a timely fashion, this Court will not issue an order compelling the production of such materials at this time. *See, e.g., United States v. Gallo,* 1999 WL 9848, at *7 (S.D.N.Y. January 11, 1999); *United States v. Perez,* 940 F.Supp. 540, 543 (S.D.N.Y.1996) ("Courts in this Circuit have repeatedly denied pretrial requests for discovery orders pursuant to Brady where the Government, as here, has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under Brady.").

The Court directs that all *Giglio* material and 3500 material be provided to defendant five days before trial, which is set to commence on October 9, 2001 at 9:30AM. All in limine motions must be filed by September 28, 2001. A final pre-trial conference will be held on October 5, 2001 at 11:00AM.

This constitutes the decision and order of the Court.